FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2019 MAR 11 AM 10: 03

CLERK J. Hodge
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

CLAUDIA WASHINGTON,          *
                             *
        Plaintiff,           *
                             *
        v.                   *          CV 116-107
                             *
ERIK K. FANNING, Secretary of *
the Army,                    *
                             *
        Defendant.           *

## O R D E R

Before the Court is Defendant's motion for partial dismissal and summary judgment. (Doc. 37.) The Clerk of Court gave Plaintiff timely notice of Defendant's motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 40.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam) have been satisfied. Plaintiff filed a response in opposition (Doc. 45), and Defendant filed a reply in support (Doc. 71). The time for filing materials in opposition has expired, and the motion is ripe for consideration. Upon review of the evidence of record, relevant law, and the Parties' respective briefs, Defendant's motion for partial dismissal and summary judgment (Doc. 37) is **GRANTED**.

# I. BACKGROUND

From November 2006 through October 2014, Plaintiff was employed as a civilian nursing assistant in the Connelly Health Clinic at the Dwight D. Eisenhower Army Medical Center at Fort Gordon, Georgia. (Resp. to Def.'s St. of Mat. Facts, Doc. 46, ¶ 1; Washington Dep., Doc. 51, at 14.) In 2010, Plaintiff had gastric bypass surgery to alleviate symptoms of acid reflux disease. (Washington Dep., at 23-24.) Plaintiff also had a hysterectomy and two hernia surgeries between 2010 and 2014. (Id. at 24-25.) Nevertheless, she continues to suffer from "stomach problems," including acid reflux, stomach spasms, and pain that "generates all the way . . . to [her] back." (Id. at 25-26.) These stomach problems affect Plaintiff's ability to walk and lift objects that weigh over ten pounds. (Id. at 27-28.) Furthermore, Plaintiff began suffering from depression in 2013, which causes her to "get real jumpy and nervous" when she is "around people." (Id. at 28-31.) Plaintiff also suffers from migraines that make it difficult for her to look at computer screens. (Id. at 31-34.)

The issues in this case revolve around leave Plaintiff took for a surgery related to her stomach problems. The surgery was scheduled for May 28, 2014. (Id. at 45:4-5.) Plaintiff's doctor, Doctor Choi, intended for Plaintiff to be off work to recover from May 28, 2014, through July 9, 2014. (Choi Dep., Doc. 39-5, at 24:5-25.)

2

Plaintiff attempted to use three different types of leave for her surgery — advanced sick leave,[1] donated leave,[2] and Family and Medical Leave Act ("FMLA") leave.[3] (Washington Dep., at 66; Donated Leave Recipient Form, Doc. 38-28; 2014 Surgery FMLA Request, Doc. 39-6.) For Plaintiff to take advanced sick leave, her request must be initialed, signed, or otherwise approved by the following: Captain Warner, Plaintiff's second-line supervisor; Major DiGiulio, Plaintiff's third-line supervisor; and Major Shaffer, the acting department head where Plaintiff worked.[4] (Washington Dep., at 22:4-7, 60:8-13; Resp. to Def.'s St. of Mat. Facts, ¶ 2.)

---

[1] "Sick leave" is "accrued leave which a federal employee may use for medical care for him/herself" by requesting it "within such time limits as the agency may require. An agency may require employees to request advanced approval of sick leave for medical, dental, or optical examination or treatment." (Resp. to Def.'s St. of Mat. Facts, ¶ 9.) An agency may grant "advanced sick leave" at its discretion "when required by the exigencies of the situation, for the same reasons it grants sick leave to an employee, subject to certain limitations." (Id. ¶ 11.) Before granting the advanced leave, the approving authority should "consider such matters as the expectation of return to duty, the need for the employee's services, and the benefits to the agency of retaining the employee." (Id.)

[2] The Parties use the term "donated leave" to refer to leave under the Voluntary Leave Transfer Program, which allows "a covered employee [to] donate annual leave directly to another employee who has a personal or family medical emergency and who has exhausted his or her available paid leave." Office of Personnel Management, PAY AND LEAVE, FACT SHEET: VOLUNTARY LEAVE TRANSFER PROGRAM, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact -sheets/voluntary-leave-transfer-program/ (emphasis omitted). The facts surrounding Plaintiff's request for donated leave are discussed in section III(B)(I), *infra*.

[3] Under the FMLA, a qualified Federal employee is "entitled to a total of up to [twelve] workweeks of unpaid leave during any [twelve]-month period for . . . a serious health condition of the employee that makes the employee unable to perform the essential functions of his or her positions." Office of Personnel Management, PAY AND LEAVE, FACT SHEET: FAMILY AND MEDICAL LEAVE, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact -sheets/family-and-medical-leave/. The facts surrounding Plaintiff's request for FMLA leave are discussed in section III(B)(I), *infra*.

[4] Sergeant Taylor was Plaintiff's first-line supervisor but did not play any material role in approving the leave in question. (See Washington Dep., at 22:17-21.)

On May 7, 2014, Captain Warner "asked Ms. Ransom[5] to prepare" Plaintiff's advanced sick leave request memorandum. (Warner Dep., Doc. 38-4, at 111:6-8.) Captain Warner stated she did so "in anticipation that [Plaintiff] would ask for it." (Id. at 112:3-18.) The original leave request prepared by Ms. Ransom had an end date of June 11, 2014. (Washington Dep., at 74:21-25.) At some point before she left work for surgery on May 27, 2014, Captain Warner approached Plaintiff with a revised advanced sick leave request that altered the leave end date to June 10, 2014.[6] (Id. at 74.) According to Plaintiff, Captain Warner "told [Plaintiff] that the date that Ms. Ransom had typed on [the original advanced sick leave request] was incorrect and . . . Captain Warner retyped it and wanted me to sign off on" the revised request. (Id. at 45-47.) Plaintiff refused to sign the revised request, however, wanting instead to "wait for Ms. Ransom to get back" because Plaintiff "wanted to make sure that was the correct date[] on the paperwork." (Id. at 45-47.) On May 28, 2014, Plaintiff underwent surgery. (Resp. to Def.'s St. of Mat. Facts, ¶ 39.) Plaintiff states she never went back to sign off on the revised leave request. (Washington Dep., at 76:13-15.)

On June 10, 2014, Plaintiff called Ms. Ransom and asked why she had not been paid. (Resp. to Def.'s St. of Mat. Facts, ¶ 42.)

---

[5] Ms. Ransom is the department secretary. (Resp. to Def.'s St. of Mat. Facts, ¶ 37.)
[6] Ms. Ransom was on leave during this interaction. (Washington Dep., at 45-46.)

Ms. Ransom asked Plaintiff to bring in her advanced sick leave documents. (Id.) On June 16, 2014, Plaintiff brought the advanced sick leave requests – each bearing the initials of Captain Warner and Major DiGiulio – to Sergeant Taylor's office and was "advised that her request would not be approved because [Plaintiff] did not turn in the request prior to taking leave." (Def.'s St. of Mat. Facts, Doc. 39, ¶ 44; Doc. 39-3.) Plaintiff responded the request had been prepared before May 7, 2014. (Resp. to Def.'s St. of Mat. Facts, ¶ 44.) Regardless, Ms. Thorpe, the department's chief secretary, told Plaintiff she would get the paperwork to Major Shaffer for approval. (Def.'s St. of Mat. Facts, ¶ 47; Thorpe Dep., Doc. 39-11, at 9:4-8, 11:3-12:9.)

On June 25, 2014, Major Shaffer, during a "standard inquiry," approached Captain Warner and Major DiGiulio to determine why Plaintiff was taking so much leave while already having used so much leave and whether she had proper medical authorization for the leave. (Shaffer Dep., Doc. 61, at 14:9-19.) Captain Warner and Major DiGiulio immediately denied having approved or initialed the documents. (Id. at 15:16-18; see also DiGiulio Dep., Doc. 38-29, at 17:2-9; Warner Dep., at 129:1-130:2.) Captain Warner and Major DiGiulio admitted that the initials appeared to be theirs but stated they did not place the initials on the page. (DiGiulio Dep., at 17:2-9; Warner Dep., at 119:1-10.) Captain Warner testified that she knew she did not initial the request because

she was waiting on Plaintiff to return the request back to her but Captain Warner "never got it, never. . . . [Plaintiff] was afforded every opportunity to turn in the paperwork, and she just never turned it in."[7] (Warner Dep., at 130:1-2; 132:7-12.) Major DiGiulio had a "[c]lear recollection" that she did not initial Plaintiff's request and knew she would not have initialed it because Plaintiff "had already accrued over [one-hundred] hours of advanced sick leave." (DiGiulio Dep., at 19:2, 30:8-13.) Not knowing how their initials got on Plaintiff's request, Captain Warner and Major DiGiulio concluded Plaintiff forged their initials. Plaintiff refutes this charge as "patently frivolous." (Resp. to Def.'s St. of Mat. Facts, ¶ 54.)

Once personnel "understood that [Plaintiff] had forged documents," the removal process began. (Thurman Dep., Doc. 38-11, at 51:10-12.) Ms. Thurman, the human resource specialist involved in Plaintiff's termination, stated, "It was such a severe type of thing that she had done that according to the table of penalties you could take it for the first offense all the way to removal. So that's how the decision was made." (Id. at 59:1-5.) Ms. Thurman agreed the testimony of Major DiGiulio and Captain Warner that "they both denied it totally and said they would not

---

[7] Captain Warner also knew she did not place the initials on the document because there were no circles around her initials, and she usually circles her initials. (Warner Dep., at 119:1-10.) In fact, she initials without circling "[l]ess than [one-]percent" of the time. (Id.)

have approved it anyhow, so it could not be their initials"
supported finding that Plaintiff forged the request. (Id. at 60:1-
5, 61:11-62:1.)

Ms. Thurman initiated the formal removal process sometime
between July 18, 2014, and August 19, 2014. (Id. at 46:13-24.)
On August 26, 2014, Captain Warner circulated a memorandum
analyzing Plaintiff's alleged behavior with the Douglas Factors.[8]
(Douglas Factors Memo., Doc. 39-17.) Plaintiff was given notice
of the proposed removal on September 12, 2014. (Notice of Proposed
Removal, Doc. 39-18.) On October 28, 2014, Defendant sent
Plaintiff notice of its final decision to remove Plaintiff.
(Notice of Decision to Remove, Doc. 39-20.) Plaintiff acknowledged
receipt of the notice the same day. (Id. at 3.)

On October 7, 2014, while her proposed removal was pending,
Plaintiff initiated contact with the local U.S. Equal Employment
Opportunity Commission ("EEOC"). (EEOC Compl., Doc. 39-23.)
Plaintiff filed a complaint with the EEOC on December 3, 2014.
(Id.) On November 11, 2014, Plaintiff appealed her removal to the
MSPB. (MSPB Decision, Doc. 39-25, at 1.) The Administrative Judge
conducted a hearing on April 29, 2015 (MSPB Hearing, Doc. 39-2),

---

[8] In Douglas v. Veterans Admin., 5 M.S.P.R. 280 (1981), the Merit Systems
Protection Board ("MSPB") "established criteria that supervisors must consider
in determining an appropriate penalty to impose for an act of employee
misconduct." Office of Personnel Management, THE DOUGLAS FACTORS,
https://www.opm.gov/policy-data-oversight/employee-relations/reference-
materials/douglas-factors.pdf.

and on May 6, 2015, issued a decision upholding Plaintiff's removal and finding no evidence of discrimination. (MSPB Decision.) After reviews upheld the MSPB's decision, on March 1, 2016, the EEOC gave Plaintiff the right to bring this private action against Defendant. (Am. Compl., Doc. 4, ¶ 21.) On March 30, 2016, Plaintiff filed this action "pursuant to the Rehabilitation Act in violation of Title VII of the Civil Rights Act of 1964" to recover all special and general damages and appropriate equitable remedies. (Compl., Doc. 1; Am. Compl., ¶¶ 1, 35, 37.)

## II. LEGAL STANDARDS

### A. Standard for Dismissal

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either a "facial" or "factual" attack. Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003). Jurisdictional challenges "can be decided without reference to the merits of the underlying claim," and are considered facial attacks. Id. at 924-25. In a facial attack, the complaint's allegations are deemed presumptively truthful, and the "court is required merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." Stalley v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1233 (11th Cir. 2008) (internal quotation omitted). In a factual attack, the court may consider

8

extrinsic evidence but should "treat[] the motion as a motion for summary judgment under Rule 56." <u>Morrison</u>, 323 F.3d at 925.

## B. Standard for Summary Judgment

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–24 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. <u>Id.</u> at 252; <u>accord</u> <u>Gilliard v. Ga. Dep't of Corrs.</u>, 500 F. App'x 860, 863 (11th Cir. 2012).

As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," <u>see</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor." <u>See</u> <u>United States v. Four Parcels of Real Prop.</u>, 941 F.2d 1428,

1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Walker v. Darby</u>, 911 F.2d 1573, 1576–77 (11th Cir. 1990).[9]

## III. DISCUSSION

### A. Motion to Dismiss

The Court finds Plaintiff does not bring a retaliation claim under the FMLA.[10] To the extent Plaintiff's retaliation claim can be construed as such, as noted by Defendant (Def.'s Mot. for

---

[9] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." FED. R. CIV P. 56(c)(1); see also FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). This Court's local rules further require that, along with its brief in support of a motion, a party must submit a "short[] and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried." LR 56.1, SDGa. "Each statement of material fact shall be supported by a citation to the record" and "will be deemed to be admitted unless controverted by a statement served by the opposing party." Id. Plaintiff's denials and assertions in her response to Defendant's statement of material facts (Resp. to Def.'s St. of Mat. Facts.), provided without citations to particular parts of materials in the record, are insufficient to satisfy her aforementioned obligations and, therefore, need not be considered by the Court. See FED. R. CIV. P. 56(e); Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920-22 (7th Cir. 1994). Nevertheless, the Court has considered those parts of materials in the record cited by Plaintiff in the body of her response brief and in her response to Defendant's statement of material facts.

[10] Although Plaintiff explains the FMLA rule that makes it unlawful to retaliate against an employee for exercising her rights under the FMLA (Am. Compl., ¶ 26), Plaintiff never complains that Defendant violated that rule but states only that "[b]y retaliating against Plaintiff for taking leave to accommodate her medical condition, Defendant violated the Rehabilitation Act." (Id. ¶ 28; see also Resp. to Def.'s Mot. for Summ. J., Doc. 45.) Furthermore, Plaintiff never claims she is bringing this action under the FMLA, only the Rehabilitation Act. (Am. Compl., ¶¶ 30-31; Resp. to Def.'s Mot. for Summ. J., at 1 ("Plaintiff clearly set out an action to recover under the Rehabilitation Act of 1973."))

Partial Dismissal & Summ. J., Doc. 37, at 6-9), the Court dismisses this claim for lack of subject matter jurisdiction. As an initial matter, the Court finds that Defendant's partial motion to dismiss is a facial attack on the complaint because it, as a challenge to the Court's subject matter jurisdiction, does not depend on adjudicating the merits of the case. Seaborn v. Fla., Dep't of Corrs., 143 F.3d 1405, 1407 (11th Cir. 1998) (assertion of immunity "essentially challenges a court's subject matter jurisdiction"); Johnson v. Georgia, No. 1:13-cv-3155-WSD, 2014 WL 1406415, at *2 (N.D. Ga. Apr. 9, 2014) (treating Rule 12(b)(1) motion to dismiss state claims on immunity grounds as a facial attack).

Plaintiff seeks to recover money damages as a result of the agency's alleged retaliation against her request for FMLA leave. Because Plaintiff was employed by the agency for more than twelve months, Plaintiff is considered a Title II employee for purposes of the FMLA. See 29 U.S.C. § 2611(2)(B)(1); 5 U.S.C. §§ 2105(a), 6381, 6301(2)(B) (defining Title II employees under the FMLA). Congress has provided a private right of action for Title I FMLA employees, see 29 U.S.C. § 2617(a)(2), but not for Title II FMLA employees. Souers v. Geren, No. CV 108-157, 2010 WL 1169730, at *7 (S.D. Ga. Mar. 23, 2010). The Eleventh Circuit has held that Title II federal employees may not bring private suits for retaliation based on the FMLA. Cavicchi v. Sec'y of Treasury, No. 04-10451, 2004 WL 4917357, at *6 (11th Cir. Oct. 15, 2004)

(reasoning Congress has not waived sovereign immunity for this type of claim). Accordingly, Plaintiff's retaliation claim under the FMLA is dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.[11]

## B. Motion for Summary Judgment

Plaintiff's remaining claims arise under the Rehabilitation Act of 1973, which "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability." Dalton v. Ctrs. for Disease Control & Prevention, 602 F. App'x 749, 754-55 (11th Cir. 2015) (citation omitted); accord Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 507 F.3d 1306, 1310 (11th Cir. 2007). Defendant argues the Court should grant its motion for summary judgment as to Plaintiff's claims that Defendant discriminated by (1) failing to provide her an accommodation, (2) retaliating against her, and (3) constructively discharging her.

### 1. Failure to Accommodate

For Plaintiff to establish a prima facie case of discrimination under the Rehabilitation Act, she must show (1) she has a disability, (2) she is otherwise qualified, and (3) she was

---

[11] Additionally, in her response, Plaintiff does not argue either that she made an FMLA retaliation claim or that the Court has subject matter jurisdiction over her FMLA retaliation claim, as argued by Defendant. Thus, the Court finds even if Plaintiff brought an FMLA claim, Plaintiff waived it by failing to respond to Defendant's argument that the Court has no jurisdiction over that claim. See Crosby v. Gregory, No. CV 212-140, 2014 WL 4460501, at *13 (S.D. Ga. Sept. 10, 2014); L.R. 7.5, SDGa.

subject to unlawful discrimination as a result of her disability. Garrett, 507 F.3d at 1310. As discussed below, the Court finds that Defendant did not discriminate against Plaintiff; thus, the Court declines to determine whether Plaintiff was an otherwise qualified individual with a disability.[12]

Unlawful discrimination can occur when an employer "fails to provide a reasonable accommodation" to an otherwise qualified person "unless doing so would impose an undue hardship on the employer." Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017). A reasonable accommodation enables an employee with a disability "to perform the essential functions" of a position or "to enjoy equal benefists and privileges of employment as are enjoyed by its similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (iii).

Assuming no undue hardship, an employer satisfies its requirements under the Rehabilitation Act to provide a reasonable accommodation by (1) providing a reasonable accommodation; or (2) by engaging with the employee in an interactive process to determine a reasonable accommodation, but no accommodation is provided because either (a) there is a breakdown in the process

---

[12] A disability under the Rehabilitation Act is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102 (cross referenced in 29 U.S.C. § 705(9)(B)). A person is "otherwise qualified" if able to perform the essential functions of the job in question with or without a reasonable accommodation. See Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 287 n.17 (1987).

not due to the employer or (b) there is no reasonable way to accommodate the employee.[13] See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286-87 (11th Cir. 1997) (granting summary judgment for employer when employer engaged in interactive process by proffering five accommodations, but plaintiff rejected and demanded a different accommodation); Bell v. Westrock Servs., Inc., No. 15-0148-CG-C, 2016 WL 3406117, at *9 (S.D. Ala. June 17, 2016) (finding no failure to accommodate when employer "made efforts to accommodate" the employee); see also Black v. Shinseki, No. 3:11-0675, 2013 WL 4779020, at *10-11 (S.D.W.V. Sept. 5, 2013) (summary judgment for employer when employer denied employee's "request for leave without pay, advanced sick leave, and voluntary leave donation" because when employee was asked to supplement information, the employee did not). But see Gilbert v. City of St. Charles, No. 96 C 7101, 1999 WL 182151, at *10 (N.D. Ill. Mar. 24, 1999) (denied motion for summary judgment because jury question about whether employer engaged in the interactive process by telling employee it would grant only seven days of advanced leave in a "take-it-or-leave-it" manner).

Even if the Court assumes Plaintiff is a qualified individual with a disability, Defendant did not fail to provide her an accommodation. For purposes of this section only, the Court

---

[13] No party argues that Plaintiff taking leave for her surgery was unreasonable.

assumes Plaintiff submitted a request for advanced sick leave and it was denied because Major DiGiulio stated she would not have approved the sick leave even if she had received the request. (DiGiulio Dep., at 30:8-13.) Even assuming Plaintiff's request for advanced sick leave was denied, the Court finds: (a) Defendant was not required to grant Plaintiff advanced sick leave, and (b) Defendant provided Plaintiff a reasonable accommodation and engaged in the interactive process.

### a. *Defendant was not Required to Grant Plaintiff Advanced Sick Leave*

"[A] leave of absence might be a reasonable accommodation in some cases." Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003). Leave as a reasonable accommodation can include forms of paid and unpaid leave. See 29 C.F.R. pt. 1630, App'x (a reasonable accommodation "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"); see also U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 398 (2002) (a reasonable accommodation may require employer to grant leave beyond its neutral leave policy).

Plaintiff argues that "when [advanced sick] leave[14] is a reasonable accommodation, it may be required under the Rehabilitation Act." (See Resp. to Def.'s St. of Mat. Facts, ¶ 11.) For advanced sick leave to be the required accommodation,

---

[14] Advanced sick leave is a form of paid leave.

Plaintiff must show that an employer is required to provide accrued paid leave before other forms of leave,[15] and advanced sick leave is considered accrued paid leave.

No case out of the Eleventh Circuit has evaluated whether advanced sick leave is considered a form of accrued paid leave, but cases in other circuits treat advanced leave as unaccrued leave on par with other forms of discretionary leave. See Blanchard v. LaHood, 461 F. App'x 542, 544 (9th Cir. 2011) (denied advanced leave because employee failed to provide requested information, but other leave was given); Solomon v. Vilsack, 845 F. Supp. 2d 61, 72-73 (D.D.C. 2012) (found advanced sick leave, along with other leave requests, was unreasonable), rev'd, in part, on other grounds, Solomon v. Vilsack, 763 F.3d 1 (D.D.C. 2014); Miller v. McHugh, 814 F. Supp. 2d 299, 318 (S.D.N.Y. 2011) (supervisor denied request for advanced leave as reasonable accommodation "because there was a low likelihood that [the employee] could pay back the advanced hours"). Furthermore, the facts of this case support

---

[15] Accrued leave is the only potential form of leave that an employer may be required to provide above other forms of leave. Compare U.S. Equal Emp. Opportunity Comm'n, 915.002, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002) ("Employers should allow an employee with a disability to exhaust accrued paid leave first and then provide unpaid leave. . . . An employer must allow the individual to use any accrued paid leave first, but, if that is insufficient to cover the entire period, then the employer should grant unpaid leave."), with Stewart, 117 F.3d at 1286 ("[A] qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation.") (citation and internal quotation omitted). The Court does not decide whether accrued paid leave is required but proceeds as if it is.

following the logic of the above cases because under Defendant's policy, granting advanced sick leave is "left [to] the supervisor's discretion." (Thurman Dep., at 21:5-11; see also DiGiulio Dep., at 30:2-3 ("It's not an entitled benefit."); Resp. to Def.'s St. of Mat. Facts, ¶ 11.)

After reviewing decisions in other circuits and the facts of this case, the Court finds that advanced sick leave is not accrued paid leave, and Defendant was not required to grant Plaintiff advanced sick leave over other forms of leave. The question remains, then, whether by denying Plaintiff advanced sick leave Defendant failed to reasonably accommodate Plaintiff.

    b. *Defendant Provided Plaintiff a Reasonable Accommodation and Engaged in the Interactive Process*

It is undisputed that Plaintiff attempted to use two different types of leave for her surgery apart from advanced sick leave – FMLA leave and donated leave. (Washington Dep., at 66; Donated Leave Recipient Form; 2014 Surgery FMLA Request.)

        i. *FMLA Leave*

The Court analyzes the FMLA request to determine both whether Plaintiff was given a reasonable accommodation and whether Defendant engaged in the interactive process. Plaintiff first turned in her FMLA paperwork on May 29, 2014, but it reflected incorrect dates. (Washington Dep., at 68:2-12; Ransom Statements, Doc. 39-7, ¶ 1; Resp. to Def.'s St. of Mat. Facts, ¶ 41.) The

corrected FMLA paperwork was submitted on June 10, 2014. (Ransom Statements, ¶ 1; see Resp. to Def.'s St. of Mat. Facts, ¶¶ 42–43.) That same day, Plaintiff's FMLA request was approved and went into effect. (Resp. to Def.'s St. of Mat. Facts, ¶ 43.) By granting Plaintiff FMLA leave effective June 10, 2014, until her approved recovery time ended on July 9, 2014 (see 2014 Surgery FMLA Request, at 3), Defendant granted Plaintiff a reasonable accommodation. See Santacrose v. CSX Transp., Inc., 288 F. App'x 655, 657 (11th Cir. 2008) (per curium) (Employer "reasonably accommodated [employee's] disability by allowing him to use his . . . FMLA leave to avoid working overtime shifts."); see also Brown v. Gestamp of Ala. LLC, Nos. 2:16-CV-1862-KOB, 2:17-CV-1411-KOB, 2018 WL 3455687, at *4 (N.D. Ala. July 18, 2018) (court did not dispute that FMLA leave could qualify as a reasonable accommodation, holding only that the form of FMLA given was not what plaintiff's doctor recommended); Lang v. Quintiles, Inc., No. 1:17-CV-00878-SCJ-WEJ, 2017 WL 2543329, at *3 (N.D. Ga. May 8, 2017) (finding that plaintiff stated a claim when arguing employer failed to accommodate him by denying his FMLA leave request); (Am. Compl., ¶ 24 ("Plaintiff used, as an accommodation . . . the available leave as a federal employee, including, but not limited to, FMLA leave.").

From May 28, 2014, through June 9, 2014, the record is unclear regarding whether Plaintiff was on FMLA leave or considered absent

without leave ("AWOL").[16]  (Resp. to Def.'s St. of Mat. Facts, ¶¶ 41, 43; 2014 Surgery FMLA Request, at 3.)  The Court finds that even if she was considered AWOL,[17] the fact that Defendant did not have a correct FMLA form to approve was not due to its own fault because the FMLA form submitted contained incorrect dates. Defendant engaged in the interactive process by working with Plaintiff to complete a correct FMLA request and donated leave form, as discussed below.

> ii. *Donated Leave*

Regarding the donated leave, Plaintiff initially submitted it retroactively for time taken in early April.  (Warner Dep., at 69:17-70:9.)  Captain Warner still signed the paper and sent it to Ms. Thurman.  (Id. at 70:2-21.)  Ms. Thurman told Captain Warner

---

[16] Although the approved FMLA leave request reflects dates of May 28, 2014, through July 9, 2014, as the estimated period of incapacity, the Parties agree that the FMLA leave was "effective June 10, 2014."  (Resp. to Def.'s St. of Mat. Facts, ¶ 43.)

[17] Even if Plaintiff was placed on AWOL status, this fact is not material. Plaintiff suffered no adverse action as a result of such status, and Plaintiff does not complain about being placed on AWOL status.  Plaintiff was able to take leave for her surgery with no adverse outcome for the time off.  See Retaliation, section III(B)(2), *infra*, (discussion on the reason for Plaintiff's termination).  Thus, in effect, Plaintiff was given a reasonable accommodation, just not in the paid form she requested.  Although not the same situation, the Court pulls logic from the Eleventh Circuit in Graham v. State Farm Mut. Ins., where the court found that because the "plaintiff did not suffer any repercussions" from being classified as AWOL, such classification was not materially adverse.  193 F.3d 1274, 1283-84 (11th Cir. 1999) (per curium). Here, the Court finds that if Plaintiff had followed the required steps to take FMLA leave in time, she would have been granted unpaid leave for the entire time she was absent.  Regardless, Plaintiff did, in fact, take unpaid leave for her surgery.  Using the logic from Graham, although being on AWOL status is not ideal, if there are no negative side effects from such status, then Plaintiff's time off is, in effect, no different than the time off she had while on FMLA leave.  Nonetheless, the Court does not rest on this conclusion but continues to find that even if Plaintiff was on AWOL status before June 10, such failure to participate in the interactive process lies with Plaintiff, not Defendant.

that "there was something missing on the paperwork," so "the very next day [Warner] personally returned it to [Plaintiff] and told her what needed to happen." (Id. at 70:20-24, 81:13-16, 82:22-24) (question seven — nature and severity of the medical emergency — was incomplete); see Donated Leave Recipient Form.) Plaintiff never turned in the document with a complete response to question seven. (Warner Dep., at 70:24-71:1.) On May 7, 2014, Plaintiff approached Ms. Warner about using that same donated leave form for her upcoming surgery. (Id. at 105:2-8.) Ms. Warner, again, told Plaintiff to fill in question seven and return the form to her. (Id. at 105:8-10.) Plaintiff never turned in the completed paper.[18] Thus, Captain Warner was under no obligation to grant Plaintiff the donated leave when Plaintiff failed to follow through with the required procedure, and the Court finds Defendant engaged in the interactive process.

In conclusion, even assuming Plaintiff properly requested and was denied advanced sick leave, Defendant granted Plaintiff a reasonable accommodation at least from June 10, 2014, through July 9, 2014, via FMLA leave. If Plaintiff was marked AWOL before her FMLA leave was approved, such outcome was not due to Defendant's lack of participation in the interactive process, but Plaintiff's

---

[18] Although Plaintiff's Response to Defendant's Statement of Material Facts states that "the application for [donated leave] was prepared and signed at a later date," Plaintiff fails to cite any facts in the record in support thereof, as required by Local Rule 56.1, and the Court was unable to independently verify Plaintiff's statement in the record. (Resp. to Def.'s St. of Mat. Facts, ¶ 35.)

failure to submit correct and complete forms for Defendant to approve. Having found Defendant did not discriminate against Plaintiff by failing to provide a reasonable accommodation, the Court grants Defendant's motion for summary judgment as to Plaintiff's failure to accommodate claim.[19]

2. Retaliation

Plaintiff argues Defendant violated Section 501 of the Rehabilitation Act of 1973 — "as it incorporates provisions of the Americans with Disabilities Act" ("ADA") — by retaliating against her "for taking leave to accommodate her medical condition." (Am. Compl., ¶ 28.) "The Rehabilitation Act incorporates the anti-retaliation provision . . . of the [ADA]." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 245 (11th Cir. 2011); see 29 U.S.C. § 791(f) ("The standards used to determine whether this section has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990."). Under the ADA's anti-retaliation provision, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter. . . ." 42 U.S.C. § 12203(a). Because the ADA's prohibition on retaliation is similar to Title VII's, ADA retaliation claims, and therefore, Rehabilitation Act claims,

---

[19] To the extent Plaintiff complains she should have received pay for her time off, that is an issue of pay — not accommodation — thus, irrelevant to a claim under the Rehabilitation Act. See Solomon, 845 F. Supp. 2d at 73.

are assessed under the same framework employed for retaliation claims under Title VII.  Stewart, 117 F.3d at 1287.  When there is no direct evidence[20] of retaliation, a retaliation claim must be analyzed under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of retaliation by showing (1) she engaged in statutorily protected conduct; (2) she suffered a materially adverse employment action; and (3) there was some causal relationship between the two events.  Farley v. Nationwide Mut. Ins., 197 F.3d 1332, 1336 (11th Cir. 1999).  Doing so creates a rebuttable presumption that the employer acted illegally.  McDonnell Douglas, 411 U.S. at 802.  "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [termination]."  Id.  The employer's burden is an "exceedingly light" one of production, not persuasion, which means the employer "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998); Meeks v. Computer Assocs. Intern,

---

[20] Direct evidence is "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption.  Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a disability] constitute direct evidence of discrimination."  Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (internal citations omitted).  Neither party argues there is direct evidence of retaliation.

15 F.3d 1013, 1019 (11th Cir. 1994). If the employer meets this burden, the burden shifts back to the plaintiff who can only avoid summary judgment by presenting "significantly probative" evidence that the proffered reasons are pretextual. Young v. Gen. Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988).

### a. *Prima Facie Case*

There is no dispute that Plaintiff satisfies prong two of establishing a prima facie case because she suffered a materially adverse employment action when she was terminated. Open questions, however, remain as to prongs one and three.

### i. *Statutorily Protected Conduct*

Plaintiff argues she engaged in statutorily protected conduct when she took leave as a reasonable accommodation. (Am. Compl., ¶ 28.) Defendant contends taking leave is not protected conduct. (Def.'s Mot. for Partial Dismissal & Summ. J., at 16.) Under the Rehabilitation Act, however, requesting an accommodation can be protected conduct. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001); Frazier-White v. Gee, No. 8:13-cv-1854-T-36TBM, 2015 WL 1648551, at *10 (M.D. Fla. Apr. 14, 2015) ("The parties do not dispute that [the plaintiff] engaged in statutorily protected [conduct] by requesting an accommodation. . . .").

Although, in section III(B)(1), *supra*, the Court found that Plaintiff was given a reasonable accommodation, the Court makes no

23

decision on whether Plaintiff engaged in statutorily protected conduct by requesting leave. See Wingfield v. S. Univ. of Fla., Inc., No. 8:09-cv-01090-T-24-TBM, 2010 WL 2465189, at *12-13 (M.D. Fla. June 15, 2010) (Although the plaintiff requested leave, the court found she did not engage in protected activity because the defendant was not aware she was requesting leave as a reasonable accommodation.). For the purposes of assessing Plaintiff's retaliation claim, however, the Court assumes Plaintiff meets this requirement.

### ii. *Causal Relationship*

Regarding the causal relationship prong, courts "construe this element broadly so that a plaintiff simply has to demonstrate that the protected activity and the adverse action are not completely unrelated." Burgos-Stefanelli, 410 F. App'x at 246-47 (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)). In the absence of other evidence showing causation, a plaintiff survives summary judgment by showing a "close temporal proximity between the statutorily protected [conduct] and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). A plaintiff shows such a close temporal proximity by "provid[ing] sufficient evidence that her employer had knowledge of the protected [conduct] and 'that there was a close temporal proximity between this awareness and the adverse action.'" Burgos-Stefanelli, 410 F. App'x at 246-47

24

(quoting Higdon, 393 F.3d at 1220 (a one-month disparity is "not too protracted," but a three-month disparity is insufficient to show a causal connection)).

The Court finds the date of the protected conduct for purposes of measuring temporal proximity was July 9, 2014, when Plaintiff's leave ended. Cf. Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1272 (11th Cir. 2017) (held temporal proximity, with respect to FMLA retaliation claims, measured from last day of FMLA leave). The date of the adverse action could be anytime from late July or August, when the removal process began, to October 28, 2014, the date of the notice of decision to remove. Because it is arguable that the adverse employment action began within one month of the protected conduct,[21] the Court assumes Plaintiff established a causal connection without requiring other evidence of causation.

b. *Legitimate, Nondiscriminatory Reason*

Assuming Plaintiff has shown a prima facie case of retaliation, Defendant has met its burden of production of showing it had a legitimate, nondiscriminatory reason for terminating

---

[21] The Court uses similar reasoning as in Jones in stating that if the date of the adverse action in termination cases is always the employee's last day of work, then the Court is rewarding employers who have a lengthy termination process — which is often the case for federal agencies — by removing temporal proximity as a way of establishing causation. As stated in Jones, "This outcome is unacceptable and contradictory to our caselaw, which establishes that the causation prong . . . is to be interpreted broadly and is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated." 854 F.3d at 1273 (internal quotation marks omitted).

Plaintiff. Defendant's reason for terminating Plaintiff was "making false statements on her request for advanced sick leave for the May 28, 2014 surgery by submitting the request directly to the final approving authority with her supervisors' initials forged on the request." (Def.'s Mot. for Partial Dismissal & Summ. J., at 17; Answer, Doc. 16, ¶ 20.) Because Defendant's burden is only one of production, not proof, Defendant easily meets its burden. The burden now shifts back to Plaintiff to show pretext.

### c. *Pretext*

To survive summary judgment, Plaintiff must show that Defendant's proffered reason was pretextual.[22] The plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action" by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (citation omitted), *overruled, in part, on other grounds*, Ash v. Tyson Foods., Inc., 546 U.S. 454 (2006);

---

[22] Doing so would allow Plaintiff only to survive summary judgment and "thereby reach a jury on the ultimate question of discrimination. . . . [It] does not vitiate [Plaintiff's] ultimate burden to prove by a preponderance of the evidence that [Defendant] terminated [Plaintiff] based on a discriminatory motive." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).

Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).
Evidence of intentional discrimination, not proof thereof, "is all
a plaintiff needs to defeat a motion for summary judgment." Howard
v. BP Oil Co., 32 F.3d 520, 525 (11th Cir. 1994). Evidence that
the employer's reason is false may raise enough suspicion of
pretext for the plaintiff to survive summary judgment. The
employer, however, "would be entitled to judgment as a matter of
law . . . if the plaintiff created only a weak issue of fact as to
whether the employer's reason was untrue and there was abundant
and uncontroverted independent evidence that no discrimination had
occurred." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 148 (2000). "Any believable evidence which demonstrates a
genuine issue of material fact regarding the truth of the
employer's explanation may sustain the employee's burden of
proof." Steger v. Gen. Elec. Co., 318 F.3d 1066, 1079 (11th Cir.
2003). As with all parties opposing summary judgment, Plaintiff
must put forth more than a mere scintilla of evidence in support
of her position. Anderson, 477 U.S. at 252.

In Mileski v. Gulf Coast Hosps., Inc., the supervisor's
legitimate, nondiscriminatory reason for terminating the plaintiff
was "job abandonment." No. CA 14-0514-C, 2016 WL 1295026, at *17
(S.D. Ala. Mar. 31, 2016). The Court found the plaintiff showed
pretext, in part, because the supervisor's notes about the
termination were "forward-looking" and listed "concerns about

whether [the] plaintiff's mental condition posed a risk to patients in the future and whether she would mentally abandon her job in the future, as opposed to being related to the [job abandonment at issue]." Id. at *18.

In Oliver v. TECO Energy, Inc., the Court found the plaintiff did not show pretext. No. 8:12-cv-2117-T-33TBM, 2013 WL 6836421, at *10-11 (M.D. Fla. Dec. 26, 2013). The plaintiff argued that summary judgment was inappropriate because the court was called to make a credibility determination between the plaintiff's statements that she had reason to violate a work rule and her supervisor's statement that the reason was untrue. Id. at *10. The Court found that even if the plaintiff had a reason to violate the work rule, the record showed that the decision maker believed the plaintiff did not have a reason to violate the work rule. Id. To show pretext, the plaintiff needed to offer evidence that the decision-maker's belief was not true, yet the plaintiff pointed to no evidence that the decision-maker's belief was not "honestly held." Id.

Ultimately, if "'the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason,' or showing that the decision was based on erroneous facts." Burgos-Stefanelli, 410 F. App'x at 247 (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030

(11th Cir. 2000)). Because Plaintiff has to offer evidence that the decision-makers' reason for her termination was pretextual, the Court must first determine who the decision makers are.

It is undisputed that Colonel Seehusen is the final deciding authority. (Seehusen Dep., Doc. 50, at 5:22-25.) Colonel Seehusen said he's never seen a valid leave form from Plaintiff.[23] (Id. at 14:15-16.) A valid leave form would have "[i]nitials that Mary DiGiulio and Captain Warner say are theirs and a circled approval and a signature from Major [Shaffer]."[24] (Id. at 14:18-21). The Court finds that the only relevant decision makers in this process who could have retaliated against Plaintiff are Captain Warner and Major DiGiulio.[25] Thus, to prevail, Plaintiff must first show

---

[23] Plaintiff's argument that Colonel Seehusen retaliated against Plaintiff is without merit. (See Am. Compl; Resp. to Def.'s Mot. for Summ. J.) Colonel Seehusen testified that Plaintiff was terminated because "[Major] Di[G]iulio and Captain Warner stated . . . that they did not initial the leave form" and "as part of a larger picture." (Seehusen Dep., at 13:1-7.) In brief, Plaintiff states the "larger picture" Colonel Seehusen refers to suggests discrimination (Resp. to Def.'s Mot. for Summ. J., at 7), however, a few lines down Colonel Seehusen explains that "there is no signature from the Department Chief who is the actual approval authority. So that is why I say that there's more to this story than simply whether or not these initials were forged or not." (Seehusen Dep., at 14:5-11.) Colonel Seehusen, however, denied that the lack of the Department Head's signature was part of the reason Plaintiff was terminated, but stated only that without the department head's signature, "there was nothing to make me believe that she had a valid leave form." (Id. at 14:25-15:1.) Colonel Seehusen's statements do not show pretext.

[24] Although Colonel Seehusen stated Major Lanham, this name is incorrect because at the time in question, Major Shaffer was covering as the Department Chief for Major Lanham who was out on leave. (Seehusen Dep., 14:7-8; Shaffer Dep., 9:22-10:9.) Nevertheless, Plaintiff has provided no evidence or argument that Major Shaffer retaliated against Plaintiff.

[25] The Court recognizes that other individuals were involved in the termination process. However, even if a person who does discriminate against a plaintiff has "a role in the decisions," that does not necessarily mean "the decisions were motivated by discriminatory animus towards [a plaintiff]'s disability." Bell, 2016 WL 3406117, at *9.

enough evidence for a reasonable juror to find that Captain Warner or Major DiGiulio was a decision maker. Second, Plaintiff must attack their legitimate, nondiscriminatory reason "head on" such that a reasonable juror could find the reason pretextual.

i. *Decision Makers*

There are no genuine issues of material fact regarding Captain Warner and Major DiGiulio's involvement in Plaintiff's termination. Captain Warner was involved in the termination process by telling Major Shaffer she believed Plaintiff forged her initials, drafting the Douglas Factors memorandum, and preparing the notice of proposed removal. Captain Warner, acting alone, lacked the authority to terminate Plaintiff. (See Seehusen Dep., at 5:22-25.) Regardless, because Captain Warner played a significant role in Plaintiff's termination, the Court treats her as a decision maker.

It does not appear from the record that Major DiGiulio was involved in the process of terminating Plaintiff other than expressing her belief that she did not sign the advanced sick leave request submitted by Plaintiff. There is no evidence that Major DiGiulio recommended Plaintiff's termination or was otherwise involved apart from her statement to Major Shaffer. Thus, Major DiGiulio is not a decision maker in this case, and whether she had discriminatory intent is irrelevant. See Oliver, 2013 WL 6836421, at *10 (coworkers could have been "lying through their teeth"

when reporting misconduct, but that is no evidence that the decision[-]maker's reason for terminating the plaintiff was pretextual). Nevertheless, the Court will analyze Major DiGiulio as a decision maker and respond to the six reasons Plaintiff posits as showing Major DiGiulio lacks credibility. (Resp. to Def.'s Mot. for Summ. J., at 8.)

### ii. *Evidence of Pretext*

From Captain Warner and Major DiGiulio's point of view, there are three possible scenarios. First, they did not sign the request and believed Plaintiff forged their initials. Second, they did sign the request, forgot, and believed Plaintiff forged their initials. Third, they did sign the request, remembered, and lied about believing Plaintiff forged their initials.

Evidence that the first two scenarios occurred would not amount to pretext because, in both scenarios, Captain Warner and Major DiGiulio believed Plaintiff committed forgery. Put simply, "it is not the [p]laintiff's belief that controls, but whether the [d]efendant believed that the [p]laintiff had engaged in the behavior for which it took action."[26] <u>Oliver</u>, 2013 WL 6836421, *8.

---

[26] "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." <u>Damon</u>, 196 F.3d at 1363 n.3 (internal quotation marks and emphasis omitted). Thus, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." <u>Id.</u> According to the Eleventh Circuit:

> [I]n carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of

31

Thus, offering evidence that either Captain Warner or Major DiGiulio actually initialed the request without evidence as to their belief about that fact is insufficient to show pretext.[27]

To show pretext, then, Plaintiff must attack Captain Warner and Major DiGiulio's belief "head on" by offering evidence that they did not believe Plaintiff forged the initials. Put differently, the only evidence sufficient to show pretext is that Captain Warner and Major DiGiulio lied about believing Plaintiff forged the initials. Having narrowed the evidence relevant to pretext, the court examines that evidence. Plaintiff argues there are issues of fact enough to survive summary judgment shown through (I) discrepancies in testimony and (II) handwriting experts.

## I. Discrepancies in Testimony

When Major Shaffer examined Plaintiff's request for leave, he conducted a "standard inquiry" to determine why Plaintiff was taking so much leave while already having used so much and whether

---

law. In the workaday world, not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury. Therefore, an employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth.

Equal Emp't Opportunity Comm'n v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

[27] Although evidence that Captain Warner and Major DiGiulio initialed the request is relevant to whether they believed they initialed the request, it is not enough on its own to show pretext because it is not more than a mere scintilla of evidence. Without evidence as to what Captain Warner and Major DiGiulio believed, there is insufficient evidence on which the jury could reasonably find for Plaintiff. Moreover, as shown below, Plaintiff puts forth no evidence that either Captain Warner or Major DiGiulio initialed the request, only conclusory allegations.

32

she had proper medical authorization for the leave. During the inquiry, Major Shaffer talked with Major DiGiulio and Captain Warner, who said "they actually did not authorize [eighty] hours of advanced sick leave." (Shaffer Dep., at 15:16-18.) Major DiGiulio stated she has a "[c]lear recollection" that she "never put [her] initials on this document." Ms. Thurman agreed that the evidence supported finding that Plaintiff forged the documents because Captain Warner and Major DiGiulio "both denied it totally and said they would not have approved it anyhow so it could not be their initials."

Plaintiff's testimony does not present evidence on whether Captain Warner or Major DiGiulio ever possessed Plaintiff's request in its final form. Plaintiff does not state when Captain Warner or Major DiGiulio would have been able to initial the request. Plaintiff also does not state she witnessed Captain Warner or Major DiGiulio initial the request. (Washington Dep., at 76:1-3.) Again, however, evidence of whether Captain Warner or Major DiGiulio initialed the request would be insufficient to show pretext because their belief is what matters, and Plaintiff's testimony fails to raise even a mere scintilla of evidence that Captain Warner or Major DiGiulio were lying.

Although this fails to meet Defendant's proffered reason "head on," Plaintiff does testify that her supervisor's would "nitpick at [her] and complain about [her] not coming to work when

[she] had [her] illnesses and . . . a doctor's appointment." (Id. at 21:19-21.) Plaintiff gives no concrete examples of such past nitpicking or evidence that it occurred. More importantly, Plaintiff does not suggest that her supervisors made disparaging remarks about the leave leading to the alleged retaliation at issue. Although "[a] few disparaging remarks . . . can contribute to a circumstantial case for pretext, they are not direct evidence of discrimination" and are insufficient to show pretext without "fairly strong additional evidence support[ing] a finding of pretext." Jones v. Aaron's Inc., ___ F. App'x ___, 2018 WL 4203459, at *7 (11th Cir. Sept. 4, 2018) (disparaging remarks did not show pretext when "unrelated to the challenged employment decision"); Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002). Remarks such as the ones Plaintiff complains of are insufficient to show pretext. Such "conclusory allegations or unsupported assertions of discrimination, without more, do not raise an inference of pretext where an employer has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." Mileski, 2016 WL 1295026, at *21 (citation omitted). Therefore, through her testimony, Plaintiff has failed to show a genuine issue of fact as to what Captain Warner and Major DiGiulio believed.[28]

---

[28] Additionally, at the MSPB hearing on April 29, 2015, Plaintiff testified that she believed Captain Warner and Major DiGiulio's motive was not discrimination. When Plaintiff was asked why she thought Captain Warner and Major DiGiulio would

In her brief, Plaintiff puts forth no argument that Captain Warner's testimony lacks credibility but lists reasons why Major DiGiulio's testimony does. The Court will address each reason in turn to determine if the reasons listed raise a genuine issue of fact as to Major DiGiulio's honestly held belief about whether Plaintiff forged the initials. Plaintiff argues Major DiGiulio's "forgery charge lacks any credibility" because of the following six reasons. (Resp. to Def.'s Mot. for Summ. J., at 7-8.)

First, Plaintiff states Major DiGiulio "had not seen the document when she concluded that it was a forgery." (Id. at 8.) The Court finds this to be irrelevant because Major DiGiulio was clear that she did not remember initialing a document for Plaintiff to take leave.

---

lie about initialing Plaintiff's leave request she stated, "I believe they did it because they failed me as an employee and dropped the ball and didn't turn my paperwork in in time. . . . [And] when Major Schaffer [sic] confronted them with it, . . . they wanted to make it look like I didn't turn my paperwork in on time. So it's like they failed me." (MSPB Hearing, at 159:3-18.) Plaintiff agreed that she believed her supervisor's lied to "cover up their own mistake." (Id. at 159:19-22.) Even if the Court were to accept Plaintiff's unsupported allegation of why Plaintiff believed her supervisor's lied, these assertions are pointedly not of discrimination. The Eleventh Circuit has stated, "A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted and emphasis in original). The Court, however, also notes that the Supreme Court and the Eleventh Circuit have acknowledged that there may be instances where disbelieving the employer's proffered reason "together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308-09 (11th Cir. 2012). Thus, showing that the employer's proffered reason is false may, sometimes, be sufficient to allow a reasonable juror to find intentional discrimination even without additional evidence that the employer's real reason was discriminatory. Although the Court acknowledges that Plaintiff's statement supports finding no pretext, it does not find that her statement would, on its own, require a reasonable jury to find Plaintiff failed to establish pretext.

Second, Plaintiff states Major DiGiulio "concluded that it was a forgery because she would not have approved the advanced leave because Plaintiff was already [one-hundred] hours in the hole." (Id.) The Court finds this reason to be a legitimate reason for denying the discretionary leave, which fails to refute that Major DiGiulio believed she did not approve Plaintiff's request for leave.

Third, Plaintiff states Major DiGiulio "admits that the initials on the document appear to be hers." (Id.) Because Major DiGiulio never disputed the appearance of the initials, Plaintiff's position fails to create an issue of material fact.

Fourth, Plaintiff states Major DiGiulio "was allegedly unaware that the document was initially prepared for signature by her own secretary, Ms. Ransom." (Id.) This fact shows no pretext. At most, it shows that Major DiGiulio forgot or was unaware of that fact, which potentially shows she could have forgotten that she signed Plaintiff's request. However, any evidence that Major DiGiulio signed the request but forgot doing so fails to raise an issue of fact as to Major DiGiulio's belief.

Fifth, the brief states, "Plaintiff did not present a copy of the document for the purposes of obtaining leave, but for the purpose of showing that she had put in for the leave on a timely basis." (Id.) This fact is irrelevant and does not establish any fact showing Major DiGiulio's belief.

Sixth, Plaintiff states Major DiGiulio "did not prepare a sworn statement right away, and in an email to her superior had stated, just eight days before the sworn statement, that she was 'pretty sure' the leave request had not been initialed by her."[29] (Id.) The record reflects that Major Shaffer brought Plaintiff's request to Major DiGiulio's attention on June 25, 2014, and the next day, Major DiGiulio prepared her sworn statement. (DiGiulio Sworn Statement, Doc. 39-12.) Furthermore, although stating "pretty sure" or "likely" does not show absolute certainty, Plaintiff must produce more that this mere scintilla of evidence to show Major DiGiulio's actions were pretextual.

Ultimately, the Court believes Major DiGiulio was not in a decision-making role in Plaintiff's termination, thus, Major DiGiulio's credibility is irrelevant to show pretext. The Court, however, still addressed Plaintiff's arguments as if Major DiGiulio was a decision maker and found Plaintiff did not put forth more than a mere scintilla of evidence that Major DiGiulio's actions were pretextual. Having already concluded Plaintiff failed to raise a genuine issue of fact enough to show Captain Warner's actions were pretextual, the Court finds Plaintiff failed to show pretext through testimonial evidence.

---

[29] In the email, Major DiGiulio actually stated the document Plaintiff showed Sergeant Taylor "(but would not leave) has likely forged initials from [Captain] Warner and myself as she and I never saw the paperwork." (Doc. 39-9, at 1.)

## II. *Handwriting Experts*

The handwriting experts merely state that the initials on the requests are those of Captain Warner and Major DiGiulio. (Expert Rep. of DeKraker, Doc. 21, at 4; Reports by Experts, Doc. 20, at 5-6.) However, neither Captain Warner nor Major DiGiulio deny the truth of that statement. Instead, Captain Warner and Major DiGiulio argue that they did not place their initials on Plaintiff's request so their initials must have been placed on the document some other way. Furthermore, without the originals, the experts are unable to conclude that the initials were not forged. Id. Again, however, showing either that Captain Warner or Major DiGiulio initialed the request or that Plaintiff did not forge the request is insufficient to show pretext when Captain Warner and Major DiGiulio's beliefs are what matter.

In conclusion, the Court finds Plaintiff failed to establish her prima facie case of retaliation. Even if she did, Defendant responded with a legitimate, nondiscriminatory reason for terminating Plaintiff, and Plaintiff failed to meet her burden of showing pretext. Thus, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

### 3. Constructive Discharge

Just as required under Plaintiff's failure to accommodate claim, for Plaintiff to establish a prima facie case of discrimination under the Rehabilitation Act, she must show (1) she

has a disability, (2) she is otherwise qualified, and (3) she was subject to unlawful discrimination as a result of her disability. Being constructively discharged may support a finding of unlawful discrimination, but it requires a plaintiff to show "the terms or conditions of employment under which she is asked to work are so intolerable that a reasonable person in her position would have been compelled to resign." Thomas v. Dillard Dep't Stores, Inc., 116 F.3d 1432, 1433-34 (11th Cir. 1997).

Plaintiff states no facts that she was constructively discharged or that she resigned; the record shows she was terminated. Failing to state a claim of constructive discharge, the Court grants Defendant's motion for summary judgment as to her constructive discharge claim.[30]

## IV. CONCLUSION

Based upon the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion for partial dismissal and summary judgment (Doc. 37) is **GRANTED**. Accordingly, the Clerk is directed to **ENTER JUDGMENT** in favor of Defendant on all of Plaintiff's claims, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

---

[30] Plaintiff makes no claim that Defendant discriminated against her specifically by terminating her. (See Am. Compl.) Plaintiff's only claim involving her termination is a claim of retaliation, which is discussed, *supra*, in section III(B)(2). (Id. ¶ 31.)

**ORDER ENTERED** at Augusta, Georgia, this 17th day of March, 2019.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA